George DAVIS, Plaintiff,

v.

UNITED ARTISTS, INC., Jerome Hellman Productions, Inc., Jane Fonda, Bruce Gilbert, Nancy Dowd, Waldo Salt, Robert C. Jones, National Broadcasting Company, Inc., Home Box Office, Inc., Cinema I, Joe Doe 1–100 and John Doe 1–100, Defendants.

No. 81 Civil 2170.

United States District Court,
S. D. New York.

Sept. 22, 1982.

---

Jimmie L. Engram, Faviola A. Felix, New York City, for plaintiff.

Coudert Brothers, New York City, for defendants; Carleton G. Eldridge, Jr., Eugene Girden, Harriet S. Sugar, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

During the 1970's, both the plaintiff and the defendants in this action produced works about the Vietnam War, and both entitled their stories *Coming Home*. Plaintiff's work is a novel, published in February 1972; defendants' work is a motion picture released in February 1978. Plaintiff charges defendants with copyright infringement in violation of 17 U.S.C., section 501; false description in violation of the Lanham Act, 15 U.S.C., section 1125(a); and unfair competition in violation of New York law. Defendants move for summary judgment on all claims.

### I. Copyright Infringement

For purposes of this motion only, defendants concede the issues of access and plaintiff's ownership of the registered copyright in the novel *Coming Home*. Thus the basic issues that remain are (1) whether there are substantial similarities between the two works as viewed by an ordinary law observer,[1] and, if so, (2) whether the defendants improperly appropriated plaintiff's expression.[2] If there are no similarities that would end inquiry. If copying is established, then the issue of unlawful appropriation is reached.

In resisting the defendants' motion for summary judgment, plaintiff raises the usu-

---

1. *See Ideal Toy Corp. v. Fab-Lu, Ltd.,* 360 F.2d 1021 (2d Cir. 1966).

2. *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946), *cert. denied,* 330 U.S. 851, 67 S.Ct. 1096, 91 L.Ed.2d 1294 (1947).

al plea that there are issues of fact as to substantial similarity which require jury determination and relies in large measure upon the oft-quoted language in *Arnstein v. Porter* that "generally there should be trials in plagiarism suits."[3] However, the *Arnstein* court itself recognized that cases could "arise in which absence of similarities [may be] so patent that a summary judgment for defendant would be correct."[4] Unless the summary judgment rule is to become a dead letter,[5] it may properly be and has been enforced even in plagiarism suits.[6] Where there is no genuine issue of fact with respect to the basic legal matters to be decided, a party should not be put to the heavy burden and expense of time consuming litigation. Courts are required in copyright infringement cases, no less than in other types of litigation, to put "a swift end to meritless litigation."[7]

Plaintiff, in seeking to ward off summary judgment, has submitted the affidavit of a literary expert who opines that the two works share substantial similarities; that in the specific areas of plot, theme, mood, time, character development, setting and pace there are striking parallels between the two works. The Court on this application for summary judgment has not considered the expert's opinion.[8] So, too, the Court has not considered the denials by the various defendants of copying plaintiff's work and their statements as to the origin of the thematic concept, character development and dialogue of the motion picture or their references to another lawsuit wherein it was charged that the motion picture here at issue infringed upon a novel by another author and the defendants prevailed. These matters are all irrelevant to the issues presented by this motion. The Court has considered plaintiff's detailed exhibits wherein he has specified his claims of alleged similarities between his writing and the motion picture.[9] There is no claim of textual copying.

In the determination of this motion the Court has confined itself to a word-by-word

---

**3.** *Arnstein v. Porter,* 154 F.2d 464, 474 (2d Cir. 1946), *cert. denied,* 330 U.S. 851, 67 S.Ct. 1096, 91 L.Ed.2d 1294 (1947).

**4.** *Id.* at 473.

**5.** *Cf. Millstein v. Leland Hayward, Inc.,* 10 F.R.D. 198, 199 (S.D.N.Y.1950).

**6.** *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Alexander v. Haley,* 460 F.Supp. 40 (S.D.N.Y.1978); *Musto v. Meyer,* 434 F.Supp. 32 (S.D.N.Y.1977), *aff'd,* 598 F.2d 609 (2d Cir. 1979); *Meeropol v. Nizer,* 417 F.Supp. 1201 (S.D.N.Y.1976), *aff'd in part and rev'd in part,* 560 F.2d 1061 (2d Cir. 1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Fuld v. National Broadcasting Co., Inc.,* 390 F.Supp. 877 (S.D.N.Y. 1975); *Buckler v. Paramount Pictures,* 133 F.Supp. 223 (S.D.N.Y.1955).

**7.** *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980) (citations omitted).

**8.** *See Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 123 (2d Cir. 1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931) (Hand, Learned) ("[Expert opinions in copyright infringement cases] ought not to be allowed at all; ... We hope that in this class of cases such evidence may in the future be entirely excluded, and the case confined to the actual issues."). *See also Costello v. Loew's, Inc.,* 159 F.Supp. 782, 789 (D.D.C.1958) ("No amount of expert or lay testimony as to fancied similarities could change the obvious content of the exhibits [the alleged infringed upon and the alleged infringing work].... Nor could expert testimony affect the spontaneous and immediate impression of the plaintiff's and defendant's literary works upon the mind of the ordinary observer.")

In *Sid & Marty Krofft Television v. McDonald's Corp.,* 562 F.2d 1157, 1164–65 (9th Cir. 1977), the court held that expert testimony is admissible on the question whether two works are based on similar ideas but not whether they share similarities of expression. *See also Arnstein v. Porter,* 154 F.2d 464, 468–69 (2d Cir. 1946), *cert. denied,* 330 U.S. 851, 67 S.Ct. 1096, 91 L.Ed.2d 1294 (1947). Since the expert's affidavit which plaintiff has submitted addresses the issue of similar expression between the two works, it is properly not considered.

**9.** Plaintiff also claims that defendants' screenplays are substantially similar to his novel. Since the ultimate test of infringement must be the film as produced and broadcast, we do not consider the preliminary scripts. *See Fuld v. National Broadcasting Co., Inc.,* 390 F.Supp. 877, 882 n.4 (S.D.N.Y.1975).

reading of plaintiff's novel and a critical view of defendant's motion picture.[10] The Court finds that there is no similarity between the two works. Indeed, if the Court had read plaintiff's book and seen defendants' motion picture, unaware of this infringement action, it never would have dawned upon it, as an average observer, that there was the slightest connection between the two works other than in the common title and the subject of the Vietnam War. Moreover, even accepting arguendo plaintiff's contention of instances of substantial similarities, these relate to non-copyrightable material. The plots of the two works are as follows:

### The Novel

Plaintiff's novel is set primarily in Thailand during the Vietnam War. The three major characters are Air Force pilots: Ben, a black Harvard graduate; Childress, another black man of less privileged, more "streetwise" background and somewhat resentful toward Ben because of his Harvard education; and Stacy, a white man who is innocent and conservative or "straight." The story opens at a United States base in Thailand where the three pilots, who are roommates, are preparing for a bombing mission. Childress is going home soon, and since he does not want Ben to inherit his Thai prostitute, he plants communist literature in her room in the hope that the authorities will find the papers and declare the prostitute off limits. Soon after Childress returns to the United States, he has an affair with Rose, Ben's wife, and later kills a policeman who tries to stop him from reading anti-war literature being passed out on the streets.

In the meantime, Stacy, the white pilot, has found out about the papers which Childress planted before going home. He tries to retrieve them but fails and writes to his girlfriend back home, Roxanne, about the incident. Roxanne learns that Childress is in jail for killing the policeman. Roxanne, then living in Schenectady, New York, and

wanting to help, contacts Ben's wife, Rose, in Washington, and both visit Childress in jail. This incident prompts one of Stacy's male friends, a resident of Schenectady, who seeks the favor of Roxanne, to write Stacy implying that Roxanne and Childress are having an affair, although this is not true. The information causes Stacy to become despondent, and during a flying mission he apparently commits suicide by failing to eject himself from a burning plane.

Ben, the black pilot, does have an affair with Childress' prostitute once Childress has left Thailand. As the novel progresses, Ben becomes more and more disillusioned by the racism which he sees pervading the war in Vietnam and society back home. Eventually, he deserts while he is on R & R in Bangkok.

### The Motion Picture

Defendants' picture also contains three major characters, all of whom are white: Bob, a Marine officer who goes off to fight in Vietnam; Sally, his wife who stays at home; and Luke, a Vietnam veteran who has been returned home from the war a paraplegic. The movie opens in California when Bob is about to leave for Vietnam. After he is gone, to keep occupied, Sally volunteers in a veterans' hospital where she meets Luke, an old high school classmate. Sally and Luke become friends and, eventually, lovers. Luke, to a degree, overcomes his handicap. He expresses strong sentiments against the war, and to give expression to his views at one point chains himself and his wheel chair to the main gate of a military induction center. Sally, who at the start of the film, is a conservative military housewife, begins to develop independence as a result of her work with the disabled veterans and her relationship with Luke. She becomes involved in Luke's protest activities and befriends a woman named Vi, who lives a more free spirited life style than Sally and who contributes to Sally's new found attitude of independence. At the end of the movie, Bob returns from Viet-

---

**10.** *Cf. Reyher v. Children's Television Workshop,* 533 F.2d 87, 88, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

nam, having been discharged due to an "accidentally" self-inflicted gunshot wound. Sally ends her affair with the paraplegic Luke and stays with Bob, but FBI agents, who have been surveilling Luke and Sally due to their involvement in the anti-war movement, tell Bob about their affair. Bob, already unstable as a result of his war experiences, swims out into the ocean, apparently committing suicide.

■ Plaintiff claims that his novel and the picture are similar because both are about the Vietnam War and its effects on people's lives, and both concern love triangles in which the betrayed member of the triangle commits suicide. But these similarities are merely similarities of ideas and general concepts. It is an axiom of copyright law that the protection granted to a work extends only to the particular expression of an idea rather than the idea itself.[11] This principle attempts to reconcile two competing societal interests: rewarding an individual's ingenuity and effort while at the same time permitting the nation to benefit from further improvements or progress resulting from others' use of the same subject matter.[12]

In *Nichols v. Universal Pictures Corp.*,[13] Judge Learned Hand explained the distinction between an idea and its expression as follows:

> Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.... [T]here is a point in this series of abstractions where they are no longer protected, since other-

wise the playwright could prevent the use of his "ideas" to which, apart from their expression, his property is never extended.[14]

Thus the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characters.[15] To give an example, in *Nichols* itself, the author of the play "Abie's Irish Rose," claimed that her work had been infringed by defendant's film "The Cohens and the Kellys." Judge Hand found that the only matter common to the two stories, "a quarrel between a Jewish and an Irish father, the marriage of their children, the birth of grandchildren, and a reconciliation," was not protected because "too generalized an abstraction from what plaintiff wrote ... only a part of her ideas." As Judge Hand observed, the idea of a comedy based on conflicts between Irish and Jews and the marriage of their children is "no more susceptible of copyright than the outline of Romeo and Juliet." [16]

■ In the case at bar, the common subject of the Vietnam War and its repercussions receives totally different expression in each of the two works. Plaintiff's novel focuses mainly on the war's effect on servicemen and is set mainly in the war zone. Defendants' movie focuses primarily on the war's effect on those at home and is set primarily in California. While a major theme of the novel is racism, and two of its three major characters are black, the movie does not concern racism, but rather the physical and emotional injuries engendered

---

11. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea ... regardless of the form in which it is described ....") Section 102(b) codifies the holding of cases such as *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954) and *Baker v. Selden*, 101 U.S. 99, 102–03, 25 L.Ed. 841 (1879). Recent cases reiterating the concept include *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90–91 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976) and *Fuld v. National Broadcasting Co., Inc.*, 390 F.Supp. 877, 881 (S.D.N.Y.1975).

12. *See Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

13. 45 F.2d 119 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

14. *Id.* at 121.

15. *See Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

16. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 122 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

by the war, and none of its major characters is black. The novel contains no seriously injured serviceman analogous to the paraplegic Luke of the film. In addition to these differences, the characters' personalities are also completely different from one work to the other.

The similarities claimed by plaintiff are either strained or devoid of legal significance. An example of the "strained" category is plaintiff's argument that the friendship between Sally and Vi in the picture is copied from the relationship between Rose and Roxanne in the book. But while Sally and Vi meet early in the film and become close friends, Roxanne and Rose meet for the first time three-quarters of the way through the book and the extent of their relationship is going together to visit Childress in jail.

An example of the type of insignificant similarity claimed by plaintiff is the fact that both Sally and Rose stop straightening their hair once their husbands leave for Vietnam as a symbol of their independence. One isolated similarity such as this is simply not enough to constitute substantial similarity in the face of the other, overwhelming differences between the two works.[17]

Yet other similarities claimed by plaintiff are legally insignificant because they are *scenes a faire* [18]—sequences of events which necessarily follow from a common theme, in this instance, elements that are common in any story about the Vietnam War. Plaintiff argues, for example, that both Stacy, the white pilot in his novel, and Bob, Sally's husband in the picture, are patriotic when they go off to Vietnam, but their values become confused as a result of their war experiences. But such a character is a "stock" figure in a tale about Vietnam. The doctrine of *scenes a faire* also applies to

plaintiff's arguments that both works include FBI surveillance, anti-war figures, and a fruit stand during R & R scenes in the war zone.

In granting summary judgment on plaintiff's infringement claim, it is not amiss to refer to the observation made by our Court of Appeals some time ago:

The action as a whole has been built up, partly upon a wholly erroneous understanding of the extent of copyright protection; and partly upon that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism.[19]

## II. Lanham Act

While copyright protection does not extend to the title of a work,[20] plaintiff claims that defendants' use of the title *Coming Home* for their movie constitutes a false description or representation in violation of the Lanham Act, 15 U.S.C., section 1125(a). The Lanham Act provides:

Any person who shall ... use in connection with any goods ... a false description or representation, including words ... tending falsely to describe or represent same, and shall cause such goods ... to enter into commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

The Act has been construed to protect the title of a creative work in the limited situation when: (1) the title has acquired "secondary meaning," i.e., that the public identifies the title with the plaintiff and his work; and (2) there is a "likelihood of pub-

---

17. *Cf. Musto v. Meyer,* 434 F.Supp. 32, 36 (S.D. N.Y.1977), *aff'd,* 598 F.2d 609 (2d Cir. 1979); *Gardner v. Nizer,* 391 F.Supp. 940, 943–44 (S.D. N.Y.1975).

18. *See Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N. Y.1978).

19. *Dellar v. Samuel Goldwyn, Inc.,* 150 F.2d 612, 613 (2d Cir. 1945), *cert. denied,* 327 U.S. 790, 66 S.Ct. 802, 90 L.Ed. 1016, *rehearing denied,* 328 U.S. 878, 66 S.Ct. 1020, 90 L.Ed. 1646 (1946).

20. *See Warner Bros. Pictures, Inc. v. Majestic Pictures Corp.,* 70 F.2d 310, 311 (2d Cir. 1934).

lic confusion," i.e., that the public will be misled into believing that defendants' work originated or is associated with or sponsored by plaintiff because both works bear the same title.[21]

But plaintiff has failed to raise genuine issues of fact regarding the elements of secondary meaning and likelihood of public confusion. Plaintiff in an unsworn statement alleges only as follows:

Since 1978, I have run into many people who have thought that I "sold" the integrity of my book in order that a film be made which contained no major black characters in the manner that the book did. The most embarrassing of these occasions was a meeting in Washington with Sterling Brown, one of the elder statesmen of Afro-American literature.... He said that an underground cult had grown up around the book [*Coming Home*] because it was such a good dramatization of American life in the 1960's.

He then asked me why I had allowed the Jane Fonda film to be made of the book. Of course he said that he had not seen the film but he had spoken with someone from Atlanta just a few days before about how shameful it was to have let this happen.[22]

This multiple hearsay statement does not raise genuine factual issues sufficient to defeat a motion for summary judgment. Fed.R.Civ.P. 56(e) requires that affidavits on a motion for summary judgment "shall be made on personal knowledge" and "shall set forth such facts as would be admissible in evidence." The record is barren of any such evidence. Not a scintilla of admissible proof has been submitted by plaintiff on the issues of secondary meaning and likelihood of public confusion.[23] Defendants' motion for summary judgment is therefore granted.

## III. Unfair Competition

Plaintiff also alleges various claims for unfair competition under the common law of the State of New York. While he asserts that jurisdiction is also grounded upon diversity of citizenship, it appears from the complaint that he is a New York resident and that three defendants, movants herein, United Artists, Inc., National Broadcasting Company, Inc. and Home Box Office, Inc., are New York corporations, each with its principal place of business in the State of New York. Thus there is no diversity jurisdiction.[24]

Although the Court has subject matter jurisdiction over an unfair competition claim when it is joined with a substantial and related claim under the copyright laws,[25] in the exercise of its discretion, the Court may dismiss the pendent claim when the federal claim is dismissed prior to trial.[26] Accordingly, plaintiff's unfair competition claims under New York law are dismissed.

So ordered.

---

21. See *id.*; *National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. 733, 746–47 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir. 1974); *Brandon v. Regents of the Univ. of Cal.*, 441 F.Supp. 1086, 1091 (D.Mass.1977); *Hospital for Sick Children v. Melody Fare Dinner Theatre*, 516 F.Supp. 67, 73 (E.D.Va.1980).

22. Affidavit of George Davis at ¶ 17.

23. See *Morgan v. Sylvester*, 125 F.Supp. 380, 389–90 (S.D.N.Y.1954), *aff'd*, 220 F.2d 758 (2d Cir.), *cert. denied*, 350 U.S. 867, 76 S.Ct. 112, 100 L.Ed. 768 (1955).

24. See *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

25. 28 U.S.C. § 1338(b).

26. See *T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 829 (2d Cir. 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965); *Wham-O-Mfg. Co. v. Paradise Mfg. Co.*, 327 F.2d 748, 753 (9th Cir. 1964); *G. P. Putnam's Sons v. Lancer Books, Inc.*, 251 F.Supp. 210 (S.D.N.Y. 1966).